BRANDON M. TESSER (SBN 168476)
btesser@trgllp.com
BRIAN M. GROSSMAN (SBN 166681)
bgrossman@trgllp.com
TESSER RUTTENBERG & GROSSMAN LLP
12100 Wilshire Blvd., Suite 220
Los Angeles, CA 90025
Tel: (310) 207-4022
Fax: (310) 207-4033

Attorneys for Plaintiff
JNK ENTERTAINMENT, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

JNK ENTERTAINMENT, LLC, a Delaware limited liability company,

Plaintiff,

vs.

SP SALES AND ENTERTAINMENT, LLC, a California limited liability company; SP SALES WORLDWIDE, LLC, a California limited liability company; CRYSTAL SKY WORLDWIDE SALES, LLC, a California limited liability company; SP's CRYSTAL EDGE, LLC, a California limited liability company; and STEVEN PAUL, an individual,

Defendants.

Case No.

**COMPLAINT FOR:**

**(1) BREACH OF WRITTEN CONTRACT**
**(2) FRAUD**
**(3) NEGLIGENT MISREPRESENTATION**
**(4) BREACH OF FIDUCIARY DUTY**
**(5) CONSTRUCTIVE TRUST**
**(6) ACCOUNTING**
**(7) BREACH OF WRITTEN CONTRACT**

**DEMAND FOR JURY TRIAL**

Plaintiff JNK ENTERTAINMENT, LLC ("JNK" or "Plaintiff") alleges as follows:

## THE PARTIES

1. Plaintiff JNK is, and at all times material hereto was, a limited liability company organized under the laws of the State of Delaware with its principal place of business in Lake Forest, Illinois.

2. JNK is engaged in the business of producing and financing independent motion pictures, including the film *Pizza Man* which is the subject of certain claims in this action.

3. Defendant SP SALES AND DISTRIBUTION, LLC ("SP") is, and at all times material hereto was, a California limited liability company with its principal place of business in Los Angeles County, California. On information and belief, SP was formed for the sole purpose of participating in a joint venture with Plaintiff as alleged herein.

4. Defendant SP SALES WORLDWIDE, LLC ("SP SALES") is, and at all times material hereto was, a California limited liability company with its principal place of business in Los Angeles County, California. On information and belief, SP SALES is a foreign sales agent, engaged by producers to sell or license rights to motion pictures and television programs.

5. Defendant CRYSTAL SKY WORLDWIDE SALES, LLC ("CRYSTAL SKY SALES") is, and at all times material hereto was, a California limited liability company with its principal place of business in Los Angeles County, California. On information and belief, CRYSTAL SKY SALES is an international distributor of motion pictures.

6. Defendant SP'S CRYSTAL EDGE, LLC ("CRYSTAL EDGE") is, and at all times material hereto was, a California limited liability company with its principal place of business in Los Angeles County, California. On information and belief, CRYSTAL EDGE is engaged in the business of acquiring and selling motion pictures with budgets under $10 million.

7. Defendant STEVEN PAUL ("PAUL") is, and at all times material hereto was, an individual residing in Los Angeles, California. On information and belief Paul is a founder, officer, director, managing agent, director, or principal of Defendants SP, SP SALES, CRYSTAL SKY SALES and CRYSTAL EDGE.

/ / /

8. At all times mentioned, each Defendant was and is the agent and employee of the remaining Defendants. In doing the acts and things hereinafter mentioned, each Defendant was and is acting within the course and scope of such agency and employment, with the knowledge and consent of each other Defendant, and as authorized or ratified by each of the remaining Defendants.

9. Plaintiff is informed and believes and thereon alleges that Defendants SP SALES, CRYSTAL SKY SALES, and CRYSTAL EDGE are but an instrumentality or conduit of SP in pursuing a single venture. Among other things, all of these companies engage in substantially the same business, have common directors, officers, ownership and employees, share the same website, are all formed under PAUL's "SP" or "Crystal Edge" label, share the same business location in Los Angeles, California, and list the same attorney as their agent for service of process. Accordingly, there is such unity of interest and ownership between SP, on the one hand, and SP SALES, CRYSTAL SKY SALES, and CRYSTAL EDGE, on the other hand, that the separateness of these companies has in effect ceased and an adherence to the fiction of the separate existence of these companies would, under the circumstances, promote injustice and inequity, particularly in light of the fact that the actions of Defendants have rendered SP insolvent, while at the same time SP SALES, CRYSTAL SKY SALES, and CRYSTAL EDGE have continued to carry on substantially the same business activities as SP, and in certain instances these companies hold themselves out to the public as owning the same film properties as assets.

## JURISDICTION AND VENUE

10. The Court has diversity jurisdiction of this action under 28 U.S.C. § 1332(a) in that Plaintiff and all Defendants are citizens of and domiciled in different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

/ / /

11. As alleged herein, this Court has personal jurisdiction over Defendants because Defendants are citizens or domiciliaries of the State of California and of this District, and conduct business in this District, including a substantial part of the conduct that forms the basis of the allegations herein.

12. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## GENERAL FACTUAL ALLEGATIONS

13. PAUL is a veteran entertainment industry executive who has formed more than a dozen companies under his "SP" and "Crystal Sky" labels. On information and belief, PAUL and his "SP" and "Crystal Sky" companies are engaged in various aspects of the motion picture industry (i.e., finance, production, sales, and distribution).

14. JNK is owned by John Kapoor ("Kapoor"), a successful entrepreneur in the pharmaceutical industry who recently developed an interest in the entertainment industry. Kapoor also wrote and produced the motion picture *Pizza Man*. The rights to *Pizza Man* are owned by JNK.

### *The "Pizza Man" Agreements*

15. On or about October 28, 2011, JNK entered into a Sales Agency Deal Memo with CRYSTAL EDGE, pursuant to which CRYSTAL EDGE agreed to act as the sales agent for *Pizza Man* in all territories throughout the world ("Sales Agency Deal Memo"). A true and correct copy of the Sales Agency Deal Memo for *Pizza Man* is attached hereto as Exhibit A.

16. Under the Sales Agency Deal Memo, CRYSTAL EDGE was entitled to receive a foreign sales agency fee of 17.5% and a domestic sales agency fee of 12%, as well as the right to recoup certain expenses.

17. Paragraph 8 of the Sales Agency Deal Memo requires CRYSTAL EDGE to render quarterly statements to JNK commencing upon its first gross receipts. The quarterly statements must set forth in reasonable detail "all gross

receipts received, recoupable expenses, and permitted fees." CRYSTAL EDGE must also provide JNK with copies of all fully executed distribution agreements for *Pizza Man* "as soon as reasonably possible after full execution of such distribution agreements." However, to date, no quarterly statements have been provided by CRYSTAL EDGE to JNK. Nor has CRYSTAL EDGE never provided copies of executed distribution agreements for *Pizza Man*.

18. In or about March 2013, PAUL proposed to JNK that he wished to amend the Sales Agency Deal Memo. PAUL supplied only vague reasons for the proposed amendment.

19. On or about March 18, 2013, JNK and CRYSTAL EDGE agreed to amend the Sales Agency Deal Memo to permit JNK to enter into a Distribution Agreement with non-party SP Distribution, LLC ("SP Distribution") for domestic rights to *Pizza Man* (the "Addendum"). A true and correct copy of the Addendum is attached hereto as Exhibit B.

20. Previously, on or about February 5, 2013 (before the date of the Addendum), JNK and SP Distribution entered into a Multiple Rights Distribution Agreement for *Pizza Man* whereby JNK granted certain licensed rights to SP Distribution, contingent upon payment of a Minimum Guarantee in the amount of $60,000 (the "Distribution Agreement"). Under the Distribution Agreement, SP Distribution was entitled to a distribution fee of 70% for *Pizza Man*.

21. JNK is informed and believes that SP Distribution subsequently entered into a sub-license agreement with Anderson Media (Walmart) for *Pizza Man* pursuant to which Anderson Media paid an advance or minimum guarantee to SP Distribution for the U.S. video rights to the picture (the "Anderson Agreement"). JNK has repeatedly asked for a copy of the Anderson Agreement, but it has never been provided.

22. SP Distribution is presently in default under the Distribution Agreement for failing to pay the $60,000 minimum guarantee to effectuate the

transfer of rights to the picture. Concurrently with the filing of this action, JNK will send SP Distribution a notice of default.

23. On information and belief, JNK alleges that PAUL knew about the Anderson Agreement before he asked JNK to execute the Addendum, yet PAUL concealed this fact from JNK. The real purpose for the Addendum was to enrich PAUL by significantly increasing the fees that he would receive (from 12% as sales agent to 70% as distributor). CRYSTAL EDGE could have easily brokered or arranged the Anderson Agreement under the Sales Agency Deal Memo for a 12% fee.

***JNK and PAUL Discuss Forming a Joint Venture to Acquire and Sell Motion Pictures and Television Programs***

24. In or about August 2013, PAUL approached Kapoor regarding the possibility of a forming a joint venture to acquire and exploit motion pictures. PAUL knew from their discussions regarding *Pizza Man* that Kapoor was a successful entrepreneur with an interest in the entertainment industry. PAUL proposed that JNK invest several million dollars of capital in a new PAUL entity to be formed solely for the joint venture. The new entity would use JNK's capital to acquire and exploit films on behalf of the venture. The parties would agree to split any profits on a 50/50 basis after JNK's investment was recouped and certain expenses were paid.

25. Kapoor had basic questions about the economics of the proposed venture. In particular, he wanted to know how quickly revenues would be generated by the acquired rights, and what kinds of revenues could be expected based on the acquisition costs. PAUL provided Kapoor with written projections and estimates reflecting that revenues would be generated relatively quickly–within a few months of each acquisition. For instance, PAUL explained that rights acquired at one festival could be sold a month or two later at the next festival, with the monies coming in concurrently with the deals being signed, or

very soon thereafter.

26. Kapoor had some concerns about the venture, as well. Kapoor knew that PAUL had a number of existing entities already engaged in the business of film sales, acquisition and distribution. Therefore, Kapoor insisted that the expenses associated with PAUL's existing businesses be kept separate from the venture, and that no overhead or expenses from these business be charged to the venture. PAUL told Kapoor that he understood his concerns and agreed to these conditions. In addition, Kapoor told PAUL that the most important thing for him was trust, and in order to have trust there must be absolute transparency in terms of how JNK's investment was spent. PAUL assured Kapoor that there would be total transparency and frequent reporting, and that JNK would even be provided access to the venture's bank accounts. Kapoor also wanted to make sure that PAUL would be intimately involved in the venture, since PAUL's experience and expertise were the most important aspect of the venture, in terms of which properties to acquire, at what price, and how best to exploit them. JNK had no interest in contributing significant sums to a venture unless PAUL would be personally involved in acquisitions and sales. PAUL assured Kapoor that he would supervise and oversee the venture and be intimately involved as Kapoor had requested.

27. PAUL was eager to receive JNK's investment in order to commence the venture. PAUL said he needed the monies "right away" given the upcoming Toronto Film Festival in September, the MIPCOM and Sitges in October, and the American Film Market ("AFM") in November. JNK did not want to miss out on these opportunities.

***The Memorandum of Understanding for the Joint Venture***

28. Accordingly, in or about September 2013, PAUL presented JNK with a short-form Memorandum of Understanding ("MOU") for signature. PAUL emphasized that once the MOU was signed the parties could get started right

away, without the delays associated with drafting and negotiating a long-form agreement. Kapoor was reluctant to sign the short-form MOU, but PAUL insisted that the monies were needed immediately and that many opportunities would be lost if the funds were delayed. Moreover, PAUL promised Kapoor on behalf of JNK that he would prepare a comprehensive long-form agreement within the next few months for the parties to sign, and even pointed to language in the MOU that required the parties to execute a long-form agreement within 60 days or fewer.

29. On or about September 4, 2013, Plaintiff (through Kapoor) and SP through PAUL) signed a MOU regarding the joint venture ("Venture"). A true and correct copy of the MOU is attached hereto as Exhibit C.

30. In the section of the MOU entitled "JNK Investment," JNK promised to advance up to $2 million in two tranches of $1 million each (the "Advances"). JNK was to fund the first tranche upon signature of the MOU and the second tranche upon SP's call for as additional funds were needed. JNK reserved the right to invest additional sums up to $5 million in its sole discretion.

31. The section of the MOU entitled "Use of Funds" specifies that the Advances were to be used solely to acquire and exploit rights in motion picture and television properties (the "Rights").

32. The section of the MOU entitled "Coverage of Expenses" specifies which expenses of the Venture may be paid by the Advances. These include (a) actual acquisition costs for acquiring the Rights (the "Acquisition Costs"); and (b) direct out-of-pocket expenses incurred to acquire and exploit the Rights (e.g., costs to attend film markets, legal fees, accounting fees, and costs to prepare trailers, brochures and other marketing materials). This section further specifies which expenses may not to be paid from the Advances. The excluded expenses include overhead (e.g., office space and utilities) and (b) costs for PAUL's services in overseeing the activities of the Venture and negotiating sales and acquisitions. Because the MOU recognized that PAUL would be attending film

markets to also acquire and sell films on behalf of his other entities, this section of the MOU clarifies that any such "shared" expenses must be allocated between the Venture and PAUL's other companies on a pro rata basis. Finally, this section states that there shall be no payments to PAUL or any related or affiliated entities without written approval from JNK.

33. The section of the MOU entitled "Reinvestment of Revenue" makes clear that the business activities of the Venture must be completely transparent, with full disclosure to JNK. This section provides in relevant part: "SP will keep JNK apprised of all acquisitions, informing it of the amount to be used for the acquisition, the nature of the production and the rights being acquired, and good faith projections in connection with the exploitation of those Rights."

34. The section of the MOU entitled "Profits" specifies how profits are to be shared. It states in relevant part: "After the payback of each and every Tranche investment, a calculation will be made: All revenues attributable to, but not limited to the exploitation of Rights shall have Expenses and Acquisition costs deducted against those revenues to arrive at a Net Revenue Figure. SP and JNK shall equally split, in a 50% to 50% proportion, these net revenues."

35. The section of the MOU entitled "Separate Account" specifies that there will be two accounts established for the Venture: one for collection of revenues from exploitation of the Rights and the other for the investment and payment of all Expenses and Acquisition costs. JNK is to be furnished online access to both accounts.

36. The section of the MOU entitled "Inspection of Books" discusses SP's obligation to keep accurate records and make them available to JNK. That section provides: "SP shall keep accurate books and records relating to the use of the Advances and the revenues from exploitation of the Rights. All such books and records will be open to inspection by JNK at reasonable times and upon reasonable notice."

37. The MOU further obligates SP to provide regular accountings to JNK on at least a monthly basis.

38. Finally, the MOU specifies that the parties are required to use their "best efforts" to draft and execute a long-form agreement within 60 days from the date of execution of the MOU.

39. Shortly after the MOU was executed, JNK wired the initial tranche of $1 million to SP (via a loan in that amount to JNK from EJ Funds LP, a financing entity affiliated with Kapoor).

***Defendants Breach the Terms of the MOU***

40. With the initial terms of the Venture agreed upon, the MOU signed, and the initial tranche of $1 million paid, JNK asked PAUL to prepare the long-form agreement he had promised, as required by the MOU. No long-form agreement was provided by PAUL or SP. Accordingly, JNK engaged its own counsel to draft a long-form agreement. In or about December 2013, JNK provided a draft of a long-form agreement to PAUL. Neither PAUL nor anyone else from SP provided any feedback or comments to the proposed long-form agreement, and no long-form was ever signed.

41. With the Venture underway, JNK expected transparency regarding how its $1 million was being spent and regular (monthly) accountings as required under the MOU. Instead, JNK was kept in the dark by PAUL and SP.

42. In late October 2013, JNK complained about SP's failure to provide any substantive information about the activities of the Venture, especially details on the acquisitions by SP and copies of any executed contracts. In response, PAUL provided vague information about two recent acquisitions but no detail regarding the rights required, or even the names of all of the titles. In response to JNK's request for executed contracts, PAUL told JNK, "Our agreement does not call for supplying contracts on deals concluded."

/ / /

43. In December 2013, SP belatedly provided four contracts to JNK covering the following titles: (a) *Will of Victory*; (b) *Last Prince of Atlantis*; (c) *Snitch* a/k/a *Absolute Killers*; and (d) a package of four 3D animated foreign films (*"MGN Titles"*).

44. JNK was surprised to learn that in certain instances (involving *Will of Victory* and *Atlantis*), SP had not actually acquired any rights in the films. Rather, an affiliated SP entity, Defendant SP SALES, was contracted to act as sales agent for the films. Later, PAUL sent JNK sales estimates for *Will of Victory* and *Atlantis*, further suggesting that the venture held an interest in these films and that any revenues would be paid directly to the Venture. PAUL's assertions were contradicted by the actual agreements themselves. On information and belief, SP is charging the Venture for costs associated with SP SALES' activities for these pictures. In any event, despite the optimistic sales projections, as far as JNK can tell, no revenues have been received by the Venture for these two pictures.

45. In December 2013, SP provided an expense statement reflecting that $55,451 in various costs (e.g., festival passes, meals, taxis, hotel expenses, etc.) had been charged to the Venture for SP to attend various film markets and film festivals (e.g., American Film Market, Cannes, MIPCOM, etc.). This amount purported to represent just the Venture's pro rata share of expenses based on only the five (or seven) films that had been "acquired" by the Venture by that time, (versus the total number of other films the other PAUL entities were selling or acquiring at these festivals). On information and belief, the allocation by PAUL was false and improper.

46. The December 2013 expense statement also reflected that SP was improperly using the Advance to pay affiliated parties and entities in violation of the MOU.

47. In late 2013, JNK learned of two other films that were "acquired" with funds from the Venture: *Chilly Christmas* and *Chavez*. JNK requested copies

of the agreements for these titles. Although PAUL promised, in an email dated December 30, 2013, to provide copies of these agreements, he has never provided them.

48. Throughout 2014, JNK made repeated requests for information, documents and accountings from SP. PAUL would belatedly respond to each request, after weeks had passed, with one excuse or another, then promise to provide the requested information, but never provide it.

49. In December 2014, JNK again requested a full accounting of costs and revenues for the Venture. PAUL responded on December 18, 2014, asking JNK to provide the second tranche of $1 million, even though PAUL and SP still had not provided any accounting.

50. On December 29, 2014, JNK's counsel notified SP that SP was in breach of the MOU for various reasons, including SP's failure to provide any accountings. JNK's counsel told SP that SP's breach excused JNK from paying the second $1 million tranche under the MOU. JNK's counsel reiterated JNK's request for a full and complete accounting of all expenses paid out of the first $1 million tranche.

51. On December 30, 2014, more than one year after the MOU was signed and the first tranche of $1 million provided, SP finally provided the first "accounting" to JNK. The December 2014 accounting reflected total costs of $1,515,151 and not a single penny in revenue. No back-up information or explanation was provided in support of these expenses.

52. On January 9, 2015, JNK provided formal notice of its request to have the books and records of the Venture inspected by its accountant. JNK asked PAUL to facilitate the scheduling with JNK's accountant, but PAUL and SP failed and refused to make the books and records available for inspection.

53. On or about March 2, 2015, JNK received a second "accounting" from SP. The March 2015 accounting reflects total expenses of $1,515,151 and

total revenues of $485,000 for a total loss of $1,030,161.

**FIRST CAUSE OF ACTION**

**[*BREACH OF WRITTEN CONTRACT* (MOU)]**

(Against Defendant SP)

54. Plaintiff realleges and incorporates herein by reference each and every allegation set forth in Paragraphs 1 through 53 hereinabove, inclusive, as though set forth at length herein.

55. Plaintiff has performed all of the terms, conditions and covenants to be performed by it pursuant to the terms of the MOU, except those obligations, if any, that were excused by Defendant's conduct.

56. Defendant SP has materially breached the MOU by, among other things, the following: (1) improperly using the Advance to fund SP's activities as a foreign sales agent, instead of using the monies to acquire Rights to motion pictures and television properties as required by the MOU; (2) using the Advance to pay business expenses for PAUL's other entities (e.g., SP SALES WORLDWIDE); (3) failing to properly allocate expenses between the Venture and PAUL's other entities; (4) improperly charging the Venture for expenses that were not actually incurred or paid; (5) improperly paying SP-affiliated companies without written approval from JNK; (6) improperly engaging third parties or employees of PAUL's other companies to perform the duties PAUL himself was to perform under the MOU at no additional cost to the Venture; (7) failing to keep JNK apprised of all acquisitions; (8) failing to inform JNK of the amounts to be used for acquisitions; (9) failing to advise JNK of the nature of the productions and rights being acquired by the Venture; (10) failing to provide JNK with good-faith projections regarding the Venture's exploitation of the Rights acquired; (11) failing to keep accurate books and records relating to the use of the Advance and the revenues from exploitation of the Rights; (12) failing and refusing to permit JNK to inspect the books and records of the Venture upon reasonable notice; (13)

failing to provide regular accountings to JNK on at least a monthly basis; and (14) failing to use SP's "best efforts" to draft a long-form agreement formalizing the ongoing nature and terms of the Venture.

57. As a direct and proximate result of Defendant's breaches of contract as alleged above, Plaintiff has suffered damages in an amount to be determined at trial but in excess of $250,000, plus pre-judgment interest thereon.

**SECOND CAUSE OF ACTION**

**[*PROMISSORY FRAUD*]**

(Against Defendants PAUL and SP)

58. Plaintiff realleges and incorporates herein by reference each and every allegation set forth in Paragraphs 1 through 57 hereinabove, inclusive, as though set forth at length herein.

59. In or about September 2013, in Arizona, PAUL made material representations to Kapoor and others on behalf of JNK, in an effort to convince JNK to form the Venture, sign the MOU, and contribute the first Advance of $1 million. Among other things, PAUL promised to Kapoor the following: (a) the Venture would receive revenues from the Rights soon after they were acquired (within a few months); PAUL provided Kapoor written projections and estimates reflecting the amounts and timing of these revenues; (b) there would be complete transparency in the operation of the Venture and that all information and documents concerning acquisitions, sales, expenses and projected sales would be made readily available to JNK in a timely fashion; (c) PAUL would personally oversee the business of the Venture and negotiate the sales and acquisitions himself; (d) even though PAUL was asking JNK to sign the MOU quickly, so the Venture could get started before the upcoming film markets and festivals, PAUL agreed that it was important to have a comprehensive long-form agreement in place and promised that he would cause one to be drafted and negotiated within two months or fewer after the MOU was signed; (e) the Advances provided by

JNK would only be used to acquire film or television rights, which rights would be owned by the Venture; (f) PAUL would not use the Advances to pay expenses to any businesses or companies connected in any way to PAUL or his other Crystal Sky- and SP-branded companies; (g) PAUL would personally exercise his good-faith efforts and use his years of expertise and experience to expertly select Rights for acquisition that could be successfully monetized and sold for profit; and (h) PAUL would maintain and operate the Venture completely separate from his other companies. These statements were made by PAUL within the course and scope of his employment with Defendants and were ratified by SP.

60. Defendants' representations were material to Plaintiff and Plaintiff reasonably relied on them by, for example, signing the MOU, providing the initial Advance of $1 million to SP, and engaging counsel to prepare a long-form agreement. Defendants intended that Plaintiff would rely on their misrepresentations and Plaintiff did so.

61. However, Defendants' representations were false and Defendants knew they were false. To the contrary, the truth was as follows: (a) PAUL knew that the Venture would not receive revenues from the Rights soon after they were acquired (within a few months) and the projections and estimates PAUL provided to Kapoor (on JNK's behalf) were false and fraudulent; (b) PAUL never intended to operate the Venture in a transparent fashion or share information with JNK; (c) PAUL never intended to be actively involved in the Venture or personally negotiate sales and acquisitions himself; PAUL instead planned to hire and pay employees of his other companies to perform these services; (d) PAUL never intended to sign a comprehensive long-form agreement; (e) PAUL intended to use the Advances as he saw fit, mainly as a capital infusion to help cash-flow at his other ongoing businesses, or as his personal piggy-bank; (f) PAUL intended to hire and pay other employees to do SP's work under the MOU; (g) PAUL never intended to spend much time or effort on the affairs of the Venture; and (h) PAUL

planned to integrate SP into the business activities of his other companies.

62. Defendants' acts and omissions were extreme and outrageous in that Defendants knew that the same violated Defendants' legal duties to Plaintiff and would and did cause Plaintiff harm. Defendants made these misrepresentations to Kapoor (on behalf of JNK) solely to cause him to trust PAUL and to get JNK to invest substantial sums in the Venture, when PAUL knew all along that what he was telling Kapoor (on behalf of JNK) was false.

63. Defendants' acts and omissions were intentional (not accidental), deliberate, willful, and done knowing they would harm Plaintiff.

64. As a direct and proximate result of such fraud, Plaintiff has suffered, and continues to suffer, compensatory damages in a sum in excess of $1 million, such sum to be precisely determined according to proof at trial.

65. Defendants were aware of the serious consequences if they defrauded Plaintiff and knew that their conduct posed a probable risk of harm to Plaintiff. Yet Defendants acted with willful and conscious disregard for Plaintiff's known rights and with the intent to vex, injure, and annoy Plaintiff, thereby constituting oppression, fraud, or malice under Cal. Civ. C. § 3294. Plaintiff therefore is entitled to punitive damages in an amount appropriate to punish and make an example of Defendants.

## **THIRD CAUSE OF ACTION**

**[*NEGLIGENT MISREPRESENTATION*]**

(Against Defendants PAUL and SP)

66. Plaintiff realleges and incorporates herein by reference each and every allegation set forth in Paragraphs 1 through 65 hereinabove, inclusive, as though set forth at length herein.

67. PAUL, on his own behalf and on behalf of SP, represented the following facts to be true: (a) the Venture would receive revenues from the Rights soon after they were acquired (within a few months); PAUL provided written

projections and estimates to Kapoor (on JNK's behalf) reflecting the projected amounts and timing of these revenues; (b) PAUL would personally oversee the business of the Venture and negotiate the sales and acquisitions himself; and (c) PAUL would maintain and operate the Venture completely separate from his other companies.

68. PAUL's representations, on his own behalf and on behalf of SP, were not true. Although PAUL may have honestly believed that these representations were true, he had no reasonable grounds for believing the representations were true when he made them. Among other things, (a) PAUL failed to use due care in providing the written projections and estimates, which were unreliable and not premised on reasonable assumptions; (b) he knew or reasonably should have known that his schedule would not permit him to personally oversee the venture and negotiate sales and acquisitions himself; and (c) he knew, or reasonably should have known, that SP lacked sufficient resources, manpower and capabilities to operate the Venture separate from his other businesses; and knew, or reasonably should have known, that these resources would be necessary to carry out the planned activities of the Venture, causing the assets and activities of the Venture to be commingled with the assets and activities of PAUL's other companies.

69. PAUL intended, on his own behalf and on behalf of SP, that JNK would rely on his representations in signing the MOU and, most importantly, in providing the initial $1 million Advance. JNK reasonably relied on PAUL's representations which were made on behalf of, and ratified by, Defendant SP.

70. JNK was harmed by PAUL's representations in providing the $1 million Advance. As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiff has suffered, and continues to suffer, compensatory damages in a sum in excess of $1 million, such sum to be precisely determined according to proof at trial.

## FOURTH CAUSE OF ACTION

## [*BREACH OF FIDUCIARY DUTY*]

(Against Defendants PAUL and SP)

71. Plaintiff realleges and incorporates herein by reference each and every allegation set forth in Paragraphs 1 through 70 hereinabove, inclusive, as though set forth at length herein.

72. As joint venturers in the Venture, SP owed Plaintiff a fiduciary duty not to put its interests ahead of JNK's interests, not to usurp or exploit the Venture's business opportunities and revenues for SP's own benefit, and to act at all times in good faith toward JNK. On information and belief, PAUL, as SP's chief executive officer, manager, majority owner, or principal shareholder, also assumed a duty not to put his own interests (or that of his other businesses) ahead of JNK's interests, not to usurp or exploit the Venture's business opportunities for his own benefit (or that of his other businesses), and to act in good faith toward JNK.

73. SP, through the conduct of its principal PAUL, breached its fiduciary duty to the Venture and to JNK by putting the interests of SP, PAUL, and PAUL's other companies ahead of the Venture by, among other things, the following: (a) using the Venture's funds (the Advances) for PAUL's other business enterprises; (b) using the Advances to acquire Rights on behalf of other entities owned or controlled by PAUL; (c) transferring the Venture's assets to other entities owned or controlled by PAUL; (d) failing to exercise good-faith efforts to maximize the assets of the Venture; (e) engaging affiliated individuals and entities to perform services on behalf of the Venture at higher than market rates instead of entering into arms-length transactions; (f) commingling the business and finances of the Venture with PAUL's other affiliated businesses; (g) failing to honestly and accurately report profits and losses from the Venture; (h) overstating the amount of expenses allocated to the Venture; (i) failing to keep accurate accounting and

financial records for the Venture; and (j) failing and refusing to permit JNK to review the books and records of the Venture.

74. By way of example only, SP's accountings include over $150,000 in expenses associated with *Pizza Man*, when that picture is not part of the Venture. (The accounting suggests that SP used the Advance to acquire *Pizza Man* from JNK, when in fact JNK already owned the rights to *Pizza Man*, and thus would have no need or desire to have the Venture acquire any such rights.) Similarly, SP's accounting reflects that revenue attributable to *Pizza Man* was commingled with revenue from other films that are part of the Venture. In addition, while SP claims to have acquired the rights to certain pictures in its own name (e.g., *Snitch* a/k/a *Absolute Killers*, *Cage of Glory* (*Chavez*), and *The Carrion Doll*), these same pictures are listed on SP's website as being owned CRYSTAL SKY WORLDWIDE. This suggests that SP has either transferred these rights to another entity, or entered into preferential agreements with affiliated entities to exploit the Rights held by the Venture so that PAUL can earn fees on both sides of the transaction.

75. As a direct and proximate result of SP's and PAUL's breach of fiduciary duty to Plaintiff, Plaintiff has suffered damages in an amount to be determined at trial.

76. By knowingly and purposefully engaging in such self-dealing activities, to the exclusion of JNK, SP and PAUL were acting with full knowledge of the consequences and damage being caused to JNK, SP's joint venturer. As such, SP's and PAUL's conduct was willful, oppressive and malicious, and Plaintiff is entitled to an award of punitive damages against SP and PAUL.

77. In doing the acts alleged herein, Defendants acted maliciously, fraudulently, oppressively, and despicably, with the wrongful intention of injuring Plaintiff, with an improper and evil motive amounting to malice, and in conscious disregard of Plaintiff's rights. Said actions were done with the intent to vex,

harass, annoy and injure Plaintiff. Punitive and exemplary damages should therefore be assessed in an amount to punish and make an example of Defendants.

**FIFTH CAUSE OF ACTION**

**[*CONSTRUCTIVE TRUST*]**

(Against Defendants SP, PAUL, SP SALES, and CRYSTAL SKY SALES)

78. Plaintiff realleges and incorporates herein by reference each and every allegation set forth in Paragraphs 1 through 77 hereinabove, inclusive, as though set forth at length herein.

79. At all times relevant herein, a fiduciary relationship existed between SP and JNK. SP and SP's principal, PAUL, owed a duty of loyalty to JNK. Plaintiff believed implicitly in the integrity and truthfulness of Defendants, and reposed absolute trust and confidence in them.

80. Commencing on or about September 4, 2013 and continuing through approximately December 2014, Defendants attended various film markets and film festivals supposedly to acquire Rights on behalf of the Venture and to sell or exploit the Rights. Defendants purported to use the $1 million Advance from JNK to acquire the Rights and to finance the exploitation of the Rights, pursuant to the MOU.

81. During that period, Defendants SP and PAUL claimed to have "acquired" certain motion pictures titles on behalf of the Venture, and to have incurred hundreds of thousands of dollars in expenses attempting to exploit them. According to Defendants, the acquired titles include *Will of Victory*; *Last Prince of Atlantis*; a package of four 3D animated foreign films ("*MGN Titles*"); *Snitch a/k/a Absolute Killers*; *Cage of Glory (Chavez)*; *Magic Christmas*; *The Carrion Doll*; *Devoured* and *The Drunk* (the "Acquired Titles").

82. While Defendants have represented to Plaintiff and Kapoor, orally and in writing, that all rights to the Acquired Titles are owned by the Venture,

various agreements, documents, and other information reflect that the rights to certain Acquired Titles are in fact held by other PAUL entities, including Defendants SP SALES and CRYSTAL SKY SALES, and not by the Venture.

83. As a result of SP's and PAUL's breaches of their fiduciary duties, they have misappropriated the rights to the Acquired Titles by acquiring them on behalf of other entities, or subsequently transferring the rights from SP to these other entities, namely, to SP SALES and CRYSTAL SKY SALES. Therefore, the Court should impose a constructive trust over the Acquired Titles, regardless of which person or entity presently possesses them, and order that any revenues and profits derived from the exploitation of the Acquired Titles be placed in constructive trust in favor of Plaintiff.

**SIXTH CAUSE OF ACTION**

[***ACCOUNTING***]

(Against Defendant SP)

84. Plaintiff realleges and incorporates herein by reference each and every allegation set forth in Paragraphs 1 through 83 hereinabove, inclusive, as though set forth at length herein.

85. A fiduciary relationship was created between Plaintiff and SP pursuant to the MOU. PAUL, SP's principal, has lied to and deceived Plaintiff regarding the monies spent, expenses incurred and revenues received by the Venture.

86. SP has breached the MOU and violated its fiduciary duties to Plaintiff as alleged hereinabove. Plaintiff has repeatedly requested information and documents from SP to gain a clearer understanding of the profits and losses of the Venture. However, SP has never provided the information and documents that Plaintiff requested. In addition, JNK engaged a CPA to inspect the Venture's books and records and sent formal notice to SP requesting such an inspection. To date, SP has failed to permit JNK an opportunity to inspect the books and records.

87. The exact balance due Plaintiff from Defendants can only be ascertained by an accounting.

88. The accounts between Plaintiff and Defendants are so complicated that an ordinary legal action demanding a fixed sum is impracticable.

**SEVENTH CAUSE OF ACTION**

**[*BREACH OF WRITTEN CONTRACT* (SALES AGENCY DEAL MEMO)]**

(Against Defendant CRYSTAL EDGE)

89. Plaintiff realleges and incorporates herein by reference each and every allegation set forth in Paragraphs 1 through 88 hereinabove, inclusive, as though set forth at length herein.

90. Plaintiff has performed all of the terms, conditions and covenants to be performed pursuant to the terms of the *Pizza Man* Sales Agency Deal Memo, except those obligations, if any, that were excused by Defendants' conduct.

91. Defendant CRYSTAL EDGE has materially breached the Sales Agency Deal Memo by, among other things, (a) failing to render quarterly statements commencing upon first receipt of gross receipts; (b) failing to provide accounting statements that set forth "in reasonable detail all gross receipts received, recoupable expenses and permitted fees"; and (c) failing to provide JNK with copies of all fully executed distribution agreements as soon as reasonably possible after full execution of such distribution agreements.

92. As a direct and proximate result of Defendant's breaches of contract as alleged above, Plaintiff has suffered damages in an amount to be determined at trial but in excess of $75,000, plus pre-judgment interest thereon.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment on its Complaint as follows:

1. For compensatory damages, including general and special damages, in a sum to be determined according to proof at trial, but in excess of $1 million, plus interest thereon at the maximum legal rate from date of breach or wrong;

2. For punitive and exemplary damages sufficient to punish and make an example of Defendants on those claims that seek such damages;

3. For a constructive trust;

4. For an accounting;

5. For all reasonable attorneys' fees, if proper and allowed by contract, statute, or otherwise;

6. For all costs of suit and other expenses incurred herein; and

7. For such other and further relief as the Court may deem just and proper.

Dated: March 13, 2015 TESSER RUTTENBERG & GROSSMAN LLP

By: *_/s/ Brandon M. Tesser_*
Brandon M. Tesser
Attorneys for Plaintiff
Plaintiff JNK Entertainment, LLC

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of all matters that may be so tried.

Dated: March 13, 2015

TESSER RUTTENBERG & GROSSMAN LLP

By: */s/ Brandon M. Tesser*
Brandon M. Tesser
Attorneys for Plaintiff
Plaintiff JNK Entertainment, LLC

# EXHIBIT A

Signed by JNK

**SALES AGENCY DEAL MEMO**

This Deal Memo dated October 28, 2011 comprises the principal Agreement between JNK Entertainment, LLC, attention Dr. John Kapoor (the "Producer") located at 1925 West Field Court, Suite 300, Lake Forest, Illinois, 60045, and SP's Crystal Edge, LLC (the "Agent" or "Sales Agent"), located at 10203 Santa Monica Blvd., 5th Floor, Los Angeles, CA 90067, whereas Agent shall act as the exclusive Sales Agent for Producer with regards to the motion picture entitled "PIZZA MAN" (the "Film") in the Territory as defined below:

**1. Film:** "Pizza Man"

**2. Territory:** The Universe

**3. Conditions Precedent:** Sales Agent's obligations herein are subject to the following conditions being satisfied in Agent's sole discretion: (1) Full execution of this Agreement and the longform agreement; (2) Producer providing clean chain of title satisfactory to Agent in and to the Film; (3) Delivery of the Film by Producer no later than 30 days from full execution of this Agreement and acceptance of delivery.

**4. Rights Granted:** All rights (including, but not limited to, Cinematic, Video, Pay TV and Free TV, PayPerView and Video On Demand, Ancillary, and Internet).

**5. Term:** Ten (10) years from Agent's acceptance of delivery of the Film. However, if Agent has not achieved a minimum of $500,000 gross from all sales in the Territory after three (3) years, Producer may elect to take back any unsold rights by providing written notice to Agent, provided Agent has recouped its marketing fee, distribution expenses, delivery fee and any costs for undelivered deliverables as set forth below.

**6. Allocation of Gross Receipts**: Allocation of any and all gross receipts shall be as follows:

(1) Agent shall first deduct its: (i) foreign sales agency fee of 17.5%; and (ii) domestic sales agency fee of 12%;

(2) Agent shall then recoup its: (i) market fee of $90,000; (ii) distribution expenses of $15,000; (iii) delivery fee of $10,000; and (iv) any costs for creating delivery materials that Producer fails to timely deliver at 125%;

(4) the remainder of proceeds shall be paid to Producer.

**8. Statements:** For the first calendar year and upon Producer's written request, commencing upon first receipt of gross receipts after acceptance of delivery, Agent shall render a quarterly statement to Producer setting forth in reasonable detail, all gross receipts received, recoupable expenses, and permitted fees. For the following two calendar years, statements shall be rendered to Producer semi-annually, then annually for all calendar years thereafter. All payments to be made to Producer by Agent shall be paid within 30 days of each statement rendered. Producer shall have the right to be provided with copies of all fully executed distribution agreements as soon as reasonably possible after full execution of such distribution agreements.

**9. Credits:** Agent or its designee shall receive a Presentation credit along with logo as well as two Executive Producer credits for Steven Paul and Jason Price (who for purposes of this paragraph shall be considered third party beneficiaries), on screen and in the main titles (only on a prospective basis), in all billing blocks, and in all paid ads. The aforementioned credits shall be in all respects on a favored nations basis with all other producer credits.

**10. Miscellaneous:** This Deal Memo is a binding Agreement upon execution by Agent and Producer. Agent and Producer intend to prepare and sign a more formal agreement incorporating the terms of this Deal Memo and additional terms contained in Agent's Sales Agency Agreement and Standard Terms and Conditions. Unless and until such an agreement is signed, this Deal Memo, which both Agent and Producer have reviewed, is a binding Agreement between the parties, and supersedes all prior agreements, written or oral. The law and courts of the State of California shall apply.

**AGREED TO AND ACCEPTED BY:**

| **JNK Entertainment, LLC ("Producer")** | **SP's Crystal Edge, LLC ("Agent")** |
|---|---|
| By: [signature] JOHN N. KAPOOR | By:________________ |
| Its: PRODUCER | Its:________________ |

# EXHIBIT B

Addendum to Sales Agency Deal Memo
"Pizza Man"

This Addendum (the "Addendum") to that Sales Agency Deal Memo dated October 28, 2011, is being entered into as of this March 18, 2013 between JNK Entertainment, LLC ("Producer") and SP's Crystal Edge, LLC ("Agent").

RECITALS

(a) Whereas, Producer and Agent entered into that certain Sales Agency Deal Memo (the "Agreement"), dated as of October 28, 2011 concerning the motion picture project entitled "Pizza Man" (the "Picture").

(b) Whereas, Producer and Agent wish to create an addendum to the Agreement.

ARTICLE 1 – ADDENDUM

1.1 USA/Canada Distribution. Producer and Agent acknowledge that Producer shall enter into a distribution agreement (the "Distribution Agreement") with SP Distribution, LLC ("SP"), granting all distribution and exploitation rights in and to the Picture to SP in the territories of the United States, Canada, and their territories and possessions. Agent hereby acknowledges and agrees, that upon full execution of the Distribution Agreement by Producer and SP, Agent shall no longer be entitled to a domestic sales agency fee as set forth in the Agreement for the territories of the United States, Canada, and their territories or possessions.

ARTICLE 2 – GENERAL PROVISIONS

2.1 Full Force and Effect. Except as expressly set forth herein, the Agreement is and shall remain unmodified and in full force and effect.

2.2 Counterparts. This Addendum may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and that all of which taken together shall constitute one and the same instrument, respectively. Delivery of an executed counterpart of this Addendum by facsimile, or electronic transmission shall be equally effective as delivery of a manually executed counterpart of this Addendum. Any party delivering an executed counterpart by facsimile, or electronic transmission shall also deliver a manually executed counterpart of this Addendum, but failure to do so shall not affect the validity, enforceability, or binding effect of this Addendum.

2.3 Final Agreement. This Addendum is intended by the parties hereto to be the final, complete, and exclusive, expression of the agreement between them with respect to the subject matter hereof. This Addendum

supercedes any and all prior oral or written agreements relating to the subject matter hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Addendum to be duly executed by their duly authorized officers as of the date first written above.

JNK ENTERTAINMENT, LLC
("PRODUCER")

BY:____________________
ITS: Producer

SP'S CRYSTAL EDGE, LLC
("AGENT")

BY:____________________
ITS:____________________

# EXHIBIT C

## MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding ("MOU") confirms the agreement by and between SP Sales and Distribution LLC ("SP"), a limited liability company to be organized under the laws of the State of California, and JNK Entertainment LLC ("JNK"), a Delaware corporation, as set forth below:

**JNK Investment:** JNK will advance up to two million dollars ($2,000,000) (the "Advances") to the Company according to the following terms:

a. Two million dollars ($2,000,000) will be made available in two (2) one-million-dollar ($1,000,000) tranches ("Tranche 1" and "Tranche 2"). Tranche 1 shall be funded upon signature of this MOU, and Tranche 2 shall be funded upon request by Capital calls(s) by SP as additional funds are needed, such Advances to be wire transferred to the designated Account of SP.

b. In addition, JNK will have the option in its sole discretion to advance up to three million dollars ($3,000,000) in one-million-dollar ($1,000,000) tranches, in JNK's sole discretion upon request by SP for a total investment of up to Five Million Dollars ($5,000,000)

**Use of Funds:** The Advances will be used to cover expense of acquiring and exploiting rights in and to motion picture and television properties (the "Rights").

**Coverage of Expenses:** The Advances may be used to pay only (a) costs of acquisition of Rights by SP (the "Acquisition Costs") and (b) direct out of pocket expenses and liabilities incurred by SP in connection with the acquisition, sales, marketing, distribution, and delivery activities associated with exploitation of the Rights (for example, costs of market attendance, legal and accounting and other professional fees relating to sales and acquisitions and collections, expenses for preparation of brochures, trailers and collateral marketing materials, and the like) (the "Expenses"). Overhead will not be paid out of the Advances and SP will be separately responsible for funding any needed overhead such as Los Angeles office space and utilities, and for procuring the services of Steven Paul to oversee its activities and negotiate sales and acquisitions. There will be an allocation of film market third party expenses; example: if at Cannes film festival there is 5 films being sold and 4 of them are films acquired under this deal – 4/5 of the costs will be attributable, and so on. There shall be no payments to any Sp or Steven Paul related parties, or to any of its or his affiliated companies, relatives or related companies without written approval from JNK.

**Reinvestment of Revenue:** Revenues generated in connection with the Rights acquired with the Advances may be used to acquire additional Rights with the aim being to acquire as many Rights as possible during the two-year period of each Advance. SP will keep JNK apprised of all acquisitions, informing it of the amount to be used for the acquisition, the nature of the production and the rights being acquired, and good faith projections in connection with the exploitation of those Rights.

Profits: After the payback of each and every Tranche investment, a calculation will be made: All revenues attributable to, but not limited to the exploitation of Rights shall have Expenses and Acquisitions costs deducted against those revenues to arrive at a Net Revenue Figure. SP and JNK shall equally split, in a 50% to 50% proportion, these net revenues. Such payment and distribution will be made at such times during the Term as SP shall determine in its business judgment, provided however that the first such distribution and payment shall be made no later that the second anniversary of the First Advance as to Tranche 1 Rights, and no later than the second anniversary of the Second Advance as to Tranche 2 Rights.

Return of Advances: To the extent recouped, the Advances shall each be repaid to JNK upon the second anniversary of the date of such Advance; i.e., two years from the date of the Tranche 1 Advance as to such Advance, and two years from the date of the Tranche 2 Advance as to such Advance.

Separate Account: Two separate accounts ("the Accounts") will be established by SP, one for the collection of all revenues generated from exploitation of Rights acquired under this Agreement and the other for the investment and payment of all Expenses and Acquisition costs. JNK will have online access to both accounts.

Inspection of Books: SP shall keep accurate books and records relating to the use of the Advances and the revenues from exploitation of the Rights. All such books and records will be open to inspection by JNK at reasonable times and upon reasonable notice.

Accountings: SP will provide regular accountings to JNK but no less often than monthly.

**JNK will have online access to the separate bank accounty**

Term: The term of this MOU shall be for fifteen years (the "Term").

SP and JNK intend that this MOU will be binding upon them and require that they use their best efforts to draft and execute long form documents no than sixty (60) days from the date of this MOU.

IN WITNESS WHEREOF, the parties hereto have executed this Memorandum of Understanding this 4th day of September 2013.

SP Sales and Distribution LLC

By: ______________________

Its: ______________________

JNK Entertainment LLC

By: ______________________

Its: ______________________